IN RE INTEREST OF ERIC O. AND SHANE O.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. JERRY R., APPELLANT.
617 N.W.2d 824

Filed October 10, 2000.   No. A-00-574.

Leta F. Fornoff, of Fornoff & Murphy, P.C., for appellant.

Joe Stecher, Dodge County Attorney, and Kevin J. Slimp for appellee.

Bradley D. Holtorf, of Sidner, Svoboda, Schilke, Thomsen, Holtorf, Boggy & Nick, for Cole C. and Patricia C.

IRWIN, Chief Judge, and SIEVERS and CARLSON, Judges.

SIEVERS, Judge.

The county court for Dodge County, sitting as a juvenile court, granted consent for Cole C. and Patricia C., the guardians of Eric O. and Shane O., to take the two boys with them when they moved to Texas. The boys' natural father, Jerry R., unsuccessfully opposed the removal and sought custody of the boys. After the juvenile court's order, Jerry appealed to this court. On July 6, 2000, we granted Jerry's motion to stay the juvenile court's order pending this appeal. At the same time, we ordered an expedited briefing and argument schedule for this appeal so that it could be heard at our September argument session. After oral argument, we lifted the stay on September 14.

## FACTUAL AND PROCEDURAL BACKGROUND

Shane, born September 17, 1991, and Eric, born December 27, 1993, were adjudicated on April 1, 1994, to be within Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1993). The boys have been

living in the home of Cole and Patricia since March 1994. On June 1, the juvenile court ordered Jerry to attend parenting and anger control classes, and to confront his substance abuse. After successful completion of the court's directives, Jerry was granted in October one visit per week with the boys, which was increased in February 1995 to two visits per week.

On June 4, 1997, the juvenile court terminated the custody of the Department of Health and Human Services (DHHS) over the boys, and the court retained its jurisdiction. On that same day, the county court for Dodge County entered an order appointing Cole and Patricia as coguardians of Shane and Eric, which was done pursuant to the stipulation of the parties. The stipulation, dated April 25, 1997, was signed by Jerry, Cole, Patricia, Jerry's parents, and the guardian ad litem. Generally, the stipulation provides that it was in the best interests of the boys that Cole and Patricia be appointed as coguardians, that there be specified visitation with Jerry, and that the grandparents would provide day care for the children. The stipulation also provided that the coguardianship would continue until further order of the court and that the residence of the boys would not be moved "more than seventy-five (75) miles from the County Court without the approval of the Court and the Guardian ad Litem." The county court's order of June 4 essentially tracks the provisions of the stipulation. The stipulation was not signed by Gloria O., the natural mother, nor did she appear at the hearing establishing the coguardianship. We note that all of the orders in this case, whether a juvenile court order or a county court order, were signed by the same judge.

However, in July 1998, Gloria moved to vacate the coguardianship on the ground that the appointment by the county court was void under a recent decision from this court. On August 13, the juvenile court filed a journal entry finding that "the Guardianship . . . is in question pursuant to In Re of Justin C., 7 Nebr. App. 251, that a motion to vacate is pending as filed by Gloria . . . ." The authority referenced is *In re Guardianship of Alice D. et al.*, 4 Neb. App. 726, 548 N.W.2d 18 (1996) (holding that county court lacked jurisdiction to appoint guardian of child who is under jurisdiction of juvenile court as result of neglect proceedings), and *In re Interest of Justin C. et*

*al.*, 7 Neb. App. 251, 581 N.W.2d 437 (1998) (expressly extending holding of *In re Guardianship of Alice D. et al.* to situations where juvenile court judge and county court judge are same person). The transcript does not have the county court's ruling on this motion to terminate the county court coguardianship, but we can infer that it was in fact terminated, because we do have an order of the juvenile court dated December 2, 1998, and filed December 11, which terminates the custody of DHHS and places custody of the boys with Cole and Patricia. This order then provides that the "Stipulation dated the 25th day of April, 1998 [which we assume actually references the stipulation of April 25, 1997] shall be incorporated into the Court Order dated the 2nd day of December, 1998." Because the transcript does not have any other order dated December 2, we assume that this somewhat awkward syntax and methodology was intended to produce the reestablishment of the guardianship by the juvenile court in accordance with *In re Guardianship of Alice D. et al.*, and *In re Interest of Justin C. et al.*, via the order of December 2. In a motion before this court, Cole and Patricia filed a sworn statement affirmatively asserting that they are the guardians pursuant to orders of the juvenile court. Therefore, we conclude from the foregoing that Cole and Patricia are indeed duly appointed and acting guardians of the boys.

In the fall of 1999, Cole was offered a job at a mortgage company in Dallas, Texas. On March 20, 2000, Cole and Patricia filed a motion to obtain the court's consent to move to Texas with the boys. The job in Texas pays $30,000 per year plus estimated commissions of between $5,000 and $7,500 per month, which would be about double what Cole presently earns from the substance abuse clinic he owns and operates. Cole's testimony was that he would work a 40-hour week rather than the 60 to 70 hours per week he currently works at his drug and alcohol clinic. Cole testified that the higher pay would give Patricia the opportunity to stay at home with the boys, and because his working hours would decrease, he would also be able to spend more time with the boys. Cole and Patricia also have extended family in the area where they wish to move.

Jerry currently has a visitation plan in place for visits with Shane and Eric and is able to see the boys weekly as well as on

alternating weekends, on holidays, and in the summers. Jerry's parents provide day care for the boys and also spend a significant amount of time with them. The boys have stated that they enjoy being with their father and want to have visits with him, and the oldest child, Shane, has said that he wishes to live with him.

Upon the filing of Cole and Patricia's motion to remove, Jerry filed a motion objecting to the move and requesting that the boys be placed with him or, in the alternative, with his parents. Jerry also made a motion for intervention by DHHS, which was denied by the court immediately before the hearing on the removal request.

Dr. Thomas Gilligan, a psychologist, testified that he had performed an evaluation of Cole and Patricia and the boys, and found that there was a strong significant attachment between them. He testified that he believed that if Cole and Patricia moved to Texas without the boys, the boys' response would be very traumatic. He further stated that unless there were very severe and extreme circumstances that would warrant a separation, or a breaking of the attachment, it would be in the boys' best interests to maintain their relationship with Cole and Patricia. Dr. Gilligan acknowledged that the boys also had a significant and beneficial relationship, attachment, and bonding with Jerry. Dr. Gilligan did not have an opinion as to whether the move to Texas was in the boys' best interests.

Dr. Julian Fabry, a psychologist, saw Shane from December 1998 to December 1999. He stated that a move to Texas would cause Shane to feel a loss with respect to his relationship with Jerry and Jerry's parents. Dr. Fabry believes that Shane has a significant relationship and bond with Jerry and that Shane enjoys the visits with Jerry. Dr. Fabry also stated that the move could have a detrimental effect on Shane, but it could also be beneficial.

Jerry testified at trial that he has repeatedly told the boys that he loves them and that he would do whatever would make them happy. He testified that the boys told him they do not want to move to Texas, that they wanted him to " 'stop this,' " and that they want to live with him. He testified that he could not afford to visit the boys in Texas. Jerry is employed full time at

Valmont, earning $13.20 per hour, with benefits. Jerry pays $279 per month in child support for the boys. He also pays support for another child from another relationship.

Attorney James Gallant has served as the boys' guardian ad litem since approximately 1994, except for a brief period of time when another attorney served as the guardian ad litem. Gallant supported the move to Texas, but on cross-examination, he admitted Jerry's positive involvement with the boys and their positive response to him. In Gallant's testimony, his basis for opposing placement with Jerry was that Jerry had a criminal record (the details of which are not in the record, although Gallant admits that the offenses did not relate to children) and that the children had been with Cole and Patricia for so long.

In its May 23, 2000, order, the juvenile court allowed the children to be moved to Texas, finding that the children's placement with Cole and Patricia was in their best interests, as they are attached and bonded to them, while placement "in the parental home would be contrary to the welfare of the children," although the court did not articulate why that would be so. The court found that Cole and Patricia "have a significant employment opportunity in the State of Texas." Jerry timely appealed.

## ASSIGNMENTS OF ERROR

Jerry's numerous assignments of error largely assail the decision, or the reasons behind it, to allow Cole and Patricia to take the children to Texas. We restate Jerry's assignments to be that the juvenile court erred in allowing the removal of the children to Texas over the objection of Jerry, who has never been determined to be an unfit parent. However, we do quote Jerry's fourth assignment of error:

> That the Court erred in finding that reasonable efforts have been made to prevent placement of the children outside of the parental home; that continuation of the children in the parental home would be contrary to the welfare of the children; that reasonable efforts are being made to make it possible for the children to have a stable home; and that the children's present placement is clearly in their best interests at this time.

While it could be clearer, we treat this assignment as assigning error to the juvenile court's decision not to place Shane and Eric with Jerry, as he requested in his motion filed April 7, 2000.

## STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings; however, when the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Clifford M. et al.*, 258 Neb. 800, 606 N.W.2d 743 (2000); *In re Interest of Sarah K.*, 258 Neb. 52, 601 N.W.2d 780 (1999).

## ANALYSIS

*Interstate Compact on Placement of Children.*

Nebraska and Texas have adopted the Interstate Compact on the Placement of Children (hereinafter referred to as "the Compact"). See, Neb. Rev. Stat. § 43-1101 (Reissue 1998); Tex. Family Code Ann. § 162.101 et seq. (Vernon 1996). Absent an exclusion, the Compact would be applicable to the movement of Shane and Eric from Nebraska to Texas. The Compact would require the satisfaction of a number of prerequisites to the move, which are absent from our record.

The Compact's purpose is to ensure that states cooperate with each other "in the interstate placement of children." § 43-1101. Article VIII of the Compact provides that the Compact does not apply to "[t]he sending or bringing of a child into a receiving state by his parent, stepparent, grandparent, adult brother or sister, adult uncle or aunt, or his guardian and leaving the child with any such relative or nonagency guardian in the receiving state." This exception is applicable in the present case, because as we earlier said, the record shows that at the time of the removal application, Cole and Patricia were court-appointed guardians of the boys. Moreover, Neb. Rev. Stat. § 43-285 (Reissue 1998) provides that when the court awards a juvenile to DHHS, an association, or an individual in accordance with the Nebraska Juvenile Code, the juvenile shall, unless otherwise ordered, become a ward and be subject to the

guardianship of the department, association, or individual to whose care he or she is committed. The Supreme Court commented on this statute in *In re Interest of C.A.*, 235 Neb. 893, 902, 457 N.W.2d 822, 828 (1990): "child custody by DSS gives the department some authority similar to a guardian's authority. See § 43-285 . . . ." We considered the above-quoted language from § 43-285 and said: "It therefore appears that if a juvenile court has awarded the care of a juvenile to DSS, an association, or an individual, the minor has a guardian by virtue of the above statute unless the juvenile court otherwise orders." *In re Guardianship of Alice D. et al.*, 4 Neb. App. 726, 730, 548 N.W.2d 18, 21 (1996).

Therefore, because the record shows that Cole and Patricia are guardians, we hold that compliance with the Compact was not a prerequisite to Shane and Eric's moving to Texas. We now turn to the merits.

*Parental Preference Doctrine*
*Versus Children's Best Interests.*

We have found no authority directly addressing whether children under guardianship and under the jurisdiction of a Nebraska juvenile court can be removed from this state by their guardians over the objection of a natural parent, who has not been determined to be unfit. As support for their position, Cole and Patricia cite cases involving a noncustodial parent who opposes the custodial parent's desire to remove a child from Nebraska. See, e.g., *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999); *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000). All of these cases have the best interests of the children at the heart of their analytical framework, and Cole and Patricia argue that the move is in the best interests of the children and that we should use the best interests of the children to decide this case.

The rule from the seminal decision in *Farnsworth, supra,* is that when determining the best interests of a child in a case where a custodial parent petitions to move out of Nebraska with the minor children, there are three broad considerations: (1) each parent's reason or motives for seeking or opposing the move, (2) the potential that the move holds for enhancing the

quality of life of the child and the custodial parent, and (3) the impact such move will have on contact between the child and the noncustodial parent. But, Cole and Patricia are not natural custodial parents seeking to remove their own children from the jurisdiction, but, rather, they are guardians seeking to remove children in their custody over the objections of the children's natural father, Jerry. That difference notwithstanding, if the instant case is determined by the children's best interests, then we can conceive of no good reason why *Farnsworth* would not be properly included in the analytical framework to determine the children's best interests. However, our first task is to determine whether the best interests test governs the core question presented by this appeal.

■ Initially, we conclude there is no absolute bar in the law, statutory or decisional, which prevents guardians from removing the children in their care from this state. Jerry has not cited any authority showing that there is an absolute bar, nor does he argue that the juvenile court exceeded its authority, as a matter of law, in allowing the move. And, we have found no authority which absolutely prohibits, as a matter of law, the juvenile court from allowing a guardian it has appointed to remove children from this state.

■ Jerry argues that he is a natural parent seeking placement of his children with him, meaning that the "parental preference" doctrine must be considered. That doctrine was defined by the Nebraska Supreme Court in *Stuhr v. Stuhr*, 240 Neb. 239, 246, 481 N.W.2d 212, 217 (1992), as follows:

> Accordingly, a court may not, in derogation of the superior right of a biological or adoptive parent, grant child custody to one who is not a biological or adoptive parent unless the biological or adoptive parent is unfit to have child custody or has legally lost the parental superior right in a child.

A recent pronouncement of the doctrine is found in *Blecha v. Blecha*, 257 Neb. 543, 599 N.W.2d 829 (1999), where the court considered the claims of a maternal grandmother and aunt to a child as against the natural father's claims. The *Blecha* court said:

> In such a situation, absent charges of abuse or neglect, the father's natural right to the custody of his children *trumps*

the interest of strangers to the parent-child relationship and the preferences of the child. See, *In re Interest of A.L.N.*, 223 Neb. 675, 392 N.W.2d 780 (1986); *In re Interest of M.*, 215 Neb. 383, 338 N.W.2d 764 (1983).

(Emphasis supplied.) 257 Neb. at 547, 599 N.W.2d at 832.

■ Nebraska law creates a "presumption" in favor of child custody with a biological parent as against an unrelated third party. *In re Interest of Amber G. et al.*, 250 Neb. 973, 554 N.W.2d 142 (1996) (holding that parental preference doctrine is recognition that relationship between parent and child is constitutionally protected). See, also, *Uhing v. Uhing*, 241 Neb. 368, 488 N.W.2d 366 (1992) (district court erred in not recognizing superior parental right of mother when mother sought return of daughter from child's grandmother). The court in *Uhing* referenced the parent's right to the care, custody, and management of his or her child as well as the child's reciprocal right to be raised by its biological parent.

Thus, parental preference means that absent unfitness or forfeiture, the natural parent prevails against an unrelated person in a custody dispute. And while this matter started as a request for court permission to remove the children, Jerry's request that the children be placed with him turns the case into a custody dispute, at least for analytical purposes. The State has never attempted to terminate Jerry's parental rights, and there is no contention advanced in this appeal that he is presently unfit. Thus, we turn to the matter of forfeiture.

■ Parental forfeiture means that parental rights "may be forfeited by substantial, continuous, and repeated neglect of a child and a failure to discharge the duties of parental care and protection." *In re Interest of Witherspoon*, 208 Neb. 755, 759, 305 N.W.2d 644, 647 (1981), citing *State v. Jenkins*, 198 Neb. 311, 252 N.W.2d 280 (1977). Forfeiture is perhaps best exemplified by *In re Interest of Kimsey*, 208 Neb. 193, 302 N.W.2d 707 (1981). In *Kimsey*, the father was a truckdriver who was rarely home, volunteered to work extra shifts, ignored the rehabilitation efforts of his wife concerning her drinking, and saw his daughter infrequently, if at all. The *Kimsey* court described the father's attitude toward the child as "carelessly indifferent," a highly descriptive phrase. 208 Neb. at 197, 302 N.W.2d at 710.

■ " 'An effective . . . forfeiture of parental rights may be effected by the indifference of a parent for a child's welfare over a long period of time.' " *Nye v. Nye*, 213 Neb. 364, 371, 329 N.W.2d 346, 350 (1983). The *Nye* court quoted *Haynes v. Haynes*, 205 Neb. 35, 39, 286 N.W.2d 108, 110 (1979), and its holding:

> While it is true that a parent has a natural right to the custody of his child, the court is not bound as a matter of law to restore a child to a parent under any and all circumstances. The welfare of a child of tender years is paramount to the wishes of the parent where it has formed a natural attachment for persons who have long been in the relation of parents with the parents' approval and consent.

The *Haynes* holding forces consideration of the fact that Shane and Eric have resided with Cole and Patricia for nearly 6 years. They have done so with Jerry's consent since at least April 25, 1997, as evidenced by the stipulation of that date which we referenced earlier in this opinion. In that stipulation, Jerry agreed that custody of Shane and Eric with Cole and Patricia was in the boys' best interests, a fact of no small import.

The record before us is skimpy on what happened at the time the boys were adjudicated in 1994 and for the first several years thereafter. The record does show that Jerry is now a constant and positive presence in the life of his children, by virtue of his exercise of his visitation rights and his financial support. Thus, we find there is no evidence in this record of long-term "careless indifference" to Shane and Eric. Therefore, Jerry has not lost parental rights by virtue of unfitness or forfeiture. However, from that conclusion, it does not necessarily follow that the parental preference doctrine is applicable and controlling, nor does such conclusion end our analysis. The reason is that there is a fundamental difference between this case and the parental preference doctrine cases which we have cited herein. That difference is that these children are adjudicated children under the juvenile code and are under the jurisdiction of the juvenile court.

At oral argument in this case, the parental preference doctrine was a prominent point of discussion, including whether it negates examination of the children's best interests, given that Jerry had not lost his parental rights by unfitness or forfeiture.

We believe that if this case was simply a custody dispute without an underlying adjudication by the juvenile court, then the holding in *Blecha v. Blecha*, 257 Neb. 543, 599 N.W.2d 829 (1999), would likely be determinative. There, the natural father's request for custody, after the death of the natural mother, was opposed by the grandmother and aunt, with whom the child desired to live. The court held that the father's natural right to the custody of his children "trumps" the interest of strangers to the parent-child relationship and the preferences of the child. However, we conclude that the parental preference doctrine is not controlling and that the best interests of the children is the proper test. The basis for our conclusion follows.

While the case before us here is admittedly one of first impression, *In re Interest of Teela H.*, 4 Neb. App. 608, 547 N.W.2d 512 (1996), is clearly analogous. There, 4-year-old Teela had been in long-term foster care. Teela was born on December 29, 1991, to Kathy H. A petition was filed in the Scotts Bluff County Court, sitting as a juvenile court, alleging that Teela was a child lacking proper parental care under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1993) by reason of the fault or habits of her mother. Teela was placed in the temporary custody of the then Department of Social Services, briefly returned to Kathy's custody on a trial basis from July 14 to August 14, 1992, but since then Teela had lived with Dave C. and Nancy C., her foster parents. The reason for the original adjudication was serious neglect of Teela by Kathy. Kathy had agreed to the establishment of a guardianship, but that was never completed. Nancy and Kathy were well acquainted, and Kathy encouraged Teela to call Dave and Nancy daddy and mommy. There was a Department of Social Services case plan for the rehabilitation of Kathy, which included goals of sobriety, Alcoholics Anonymous involvement, obtaining her high school diploma through GED, and counseling. That plan provided for unsupervised visitation. Kathy's evidence showed substantial compliance and success with the rehabilitation plan; however, Teela experienced separation anxiety at the prospect of visitation or when leaving Dave and Nancy. Kathy sought custody, which was denied, and she appealed to this court, assigning as error the denial of her motion for return of custody and the trial court's failure to set

conditions, within her ability to perform, by which Teela's return could be accomplished.

In *In re Interest of Teela H.*, we cited Kathy's argument that when a parent has reached maturity, proved by a compliance with the reunification plan, then the child should not be left in the limbo of foster care, but, rather, returned to the parent. We recognized that as a generalized statement, this was hard to dispute, but found it did not sufficiently factor the child's best interests into the equation. We said that "[t]he best interests of Teela are what must concern us, as the law is clear that this is our guidepost." 4 Neb. App. at 618, 547 N.W.2d at 519. We relied upon the proposition that the right of a parent to the custody and control of his or her child is a natural right protected by the Constitution, but such right is subject to the paramount interest which the public has in the protection of children from abuse and neglect. *In re Interest of W.*, 217 Neb. 325, 348 N.W.2d 861 (1984). That doctrine is frequently cited and obtains today. See *In re Interest of Kelley D. & Heather D.*, 256 Neb. 465, 590 N.W.2d 392 (1999).

■ We conclude from this authority that while apparently never directly stated, perhaps because it is axiomatic, the parental preference doctrine is inapplicable when children are adjudicated and under the jurisdiction of a juvenile court. Instead, the best interests of the children is the paramount consideration when the juvenile court makes decisions concerning the children, including whether their guardians can move them out of Nebraska. The best interests of the children is the hallmark of the juvenile code. See *In re Interest of R.A. and V.A.*, 225 Neb. 157, 403 N.W.2d 357 (1987), *overruled on other grounds, State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993) (juvenile code must be liberally construed to effectuate its purpose of serving best interests of those juveniles who fall within it).

### Intervention of DHHS.

Jerry assigns error to the juvenile court's denial of his motion to have DHHS intervene in the case. Jerry's assertion to the trial court was that DHHS' assistance was necessary to determine where the children should be placed and whether moving to Texas was in the boys' best interests. The juvenile court found

that DHHS intervention was unnecessary and potentially disruptive. However, the court noted that DHHS intervention would be appropriate if additional information showed that a decision regarding the children's best interests could not be reached without DHHS intervention. We quote the pertinent statute:

> Any court acting pursuant to the Nebraska Juvenile Code shall commit to the care of the Department of Health and Human Services or any regularly organized and incorporated society or institution, for the purpose of caring for and placing in good family homes, all children, except those already committed to the care of responsible persons or institutions, who have been decreed to be children as described in subdivision (3)(a) of section 43-247 and who for that reason must be removed from the care of their parents or legal guardians.

Neb. Rev. Stat. § 43-903 (Reissue 1998).

Shane and Eric have been in the care of responsible persons, Cole and Patricia, for many years with Jerry's consent. Intervention by DHHS to determine placement of the children is not mandated by the statute.

It was not an abuse of discretion to assess the best interests of the children without the intervention of DHHS. The juvenile court's decision to deny Jerry's request for DHHS intervention is not an untenable decision that unfairly deprives Jerry of a substantial right or a just result. See *Uhing v. Uhing*, 241 Neb. 368, 488 N.W.2d 366 (1992) (defining abuse of discretion). The assignment of error is without merit.

*Shane's and Eric's Best Interests.*

The juvenile court applied a best interests analysis and found that it was in the best interests of Shane and Eric to go to Texas with Cole and Patricia. Part of the analytical backdrop is that a guardian of a minor has "the powers and responsibilities of a parent who has not been deprived of custody of his minor and unemancipated child." Neb. Rev. Stat. § 30-2613 (Reissue 1995). See, also, *Cunningham v. Lutjeharms*, 231 Neb. 756, 764, 437 N.W.2d 806, 812 (1989) (citing § 30-2613, "[a] legal guardian of a minor has the powers and responsibilities of a par-

ent"). Because a guardian has the powers and responsibilities of a parent, it naturally follows that Cole and Patricia, as guardians of Shane and Eric, can in fact move from Nebraska to Texas and take the children with them absent some legal impediment or circumstance which restrains the freedom a parent would normally have to move with his or her children. There is a restraining interest here: Jerry—the children's natural father whose parental rights have not been terminated. But whether that restraining interest prevents the move is determined by the children's best interests.

The analogy of this case to situations where a custodial parent seeks to leave the state with the children and the noncustodial parent objects is compelling because those cases also involve a removal of the children from Nebraska and they are also decided on the children's best interests when there is a legitimate reason for the parents' desire to move. Thus, we return to *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), the definitive exposition on parental removal of children by a custodial parent from Nebraska over the objection of the noncustodial parent.

*Farnsworth* holds that the custodial parent must satisfy the court that there is a legitimate reason to leave the state and that it is in the best interests of the child to continue living with that parent. From *Farnsworth*, there are three broad considerations: each parent's reasons or motives for seeking or opposing the move, the potential that the move holds for enhancing the quality of life of the child and the custodial parent, and the impact such move will have on contact between the child and the noncustodial parent. *Carraher v. Carraher*, 9 Neb. App. 23, 607 N.W.2d 547 (2000), citing *Farnsworth, supra.*

In the case at hand, the juvenile court found that there was a legitimate reason for the move to Texas because of the employment opportunity present there. The evidence is that the move to Texas involves a new job for Cole at nearly double the salary with improved working conditions. There is clearly a legitimate reason for the move.

The *Farnsworth* court set forth a number of considerations with respect to the quality of life factor, including the emotional, physical, and developmental needs of the child; the child's pref-

erence as to where to live; enhancement of the parent's income; whether housing conditions would be improved; educational advantages; the quality of the relationship between the child and each parent; the strength of the child's ties to the present community and extended family; and the living conditions and employment opportunities for the custodial parent, because the best interests of the child are interwoven with the well-being of the custodial parent. The *Farnsworth* court emphasized that no one factor is determinative or automatically entitled to more weight than others. The record before us does not address each of these factors, but does show that Cole and Patricia and the boys are bonded and attached to each other, that the relationship is essentially that of parent and child, that the boys are doing well, that Shane's behavior has improved while with Cole and Patricia, and that the guardians have extended family in Texas, although Jerry has extended family in Dodge County. Living conditions will likely improve as Patricia will be able to cease working and be more available for the boys and Cole's hours will also be reduced.

Finally, the *Farnsworth* court directs that the court consider the impact on the noncustodial parent's visitation. Jerry testified he would be unable to afford to go to Texas for visitation. The juvenile court directed that the guardian ad litem submit a revised visitation plan to the court for approval. Thus, it is difficult to know the precise impact, but we assume that the time Jerry and the boys have with each other will be substantially curtailed, a factor which cuts against the move. However, given the legitimacy of the move and the absence of negative motive, we conclude that the quality of the relationship between Cole and Patricia and the boys, together with the opportunities for life enhancement for Cole and Patricia as well as the boys, outweighs the restriction of Jerry's visitation. Therefore, the move to Texas passes muster under the analysis in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999).

However, there are additional considerations here. Unlike *Farnsworth*, this case does not involve two natural parents who are unable to agree about whether one parent shall move out of state with the children. Instead, this case has its genesis in the juvenile system, and these are adjudicated children. Over the

years, there have been repeated findings by the juvenile court, none of which were appealed, that it was in the best interests that the children live with Cole and Patricia. Additionally, the guardianship was established with Jerry's consent via the stipulation in April 1997 that it was in the best interests of the children that they live with Cole and Patricia. The children have been in a parental relationship with Cole and Patricia since March 1994, Eric having lived with them since he was 2½ weeks old. The guardianship has the legal effect of placing Cole and Patricia in the role of the boys' parents. This is significant because the record establishes that Jerry has not only consented to that arrangement, but he has been content with it.

It was not until Cole and Patricia sought to leave the State of Nebraska because of Cole's job opportunity that Jerry sought placement of the children with him. In short, for many years, Jerry has been content to occupy the role of a noncustodial visiting parent while Cole and Patricia performed the day-to-day task of raising these children. The consequence of Jerry's acquiescence in this arrangement has been a strong bond between Cole and Patricia and the children. There is evidence that this bond would suffer if they were not allowed to take the children to Texas. While Jerry's bond with the children will be adversely impacted by the move, the fact is that Cole and Patricia have devoted far more time and effort to the task of being the parents of Shane and Eric day-by-day, an arrangement agreed to by Jerry. Under those circumstances, when we apply a best interests test to the resolution of this case, we must find that the best interests of the children will be served if they continue to stay with their long-term guardians, Cole and Patricia, and therefore, we affirm the order of the juvenile court allowing Cole and Patricia to remove the children to Texas.

We cannot help but recall the often-repeated admonition that children cannot and should not be suspended in foster care or made to await uncertain parental maturity. *In re Interest of Lisa W. & Samantha W.*, 258 Neb. 914, 606 N.W.2d 804 (2000). These children were in foster care for a substantial period of time before the guardianship was originally established by the county court on June 4, 1997, and then reestablished by the juvenile court on December 2, 1998. While the guardianship

confers greater legal status and power on Cole and Patricia than being foster parents and more closely approximates a natural parent-child relationship, a guardianship of this duration does not serve to effect parental reunification, a goal repeatedly set forth in our juvenile code. Whether this arrangement persisted so long because of DHHS inaction or because of Jerry's contentment therewith, or a combination thereof, is not definitively revealed by the evidence. The State conceded at oral argument that it had never moved to terminate Jerry's parental rights, which is not to suggest that they should have. It is, however, further evidence that everyone connected with this case as far as we can determine was content with the status quo so long as the children remained in Dodge County. This situation inevitably produced a deep and strong parent-child bond as well as the establishment of the custodial parent-visiting parent arrangement like we would see in a divorce case. Thus, while we understand Jerry's resistance to his children's going to Texas, the fact is that he has sought custody only at this late date, after years of apparent contentment with having Cole and Patricia raise his children. Consequently, the relationship between Cole and Patricia and the children is now essentially that of natural parent and child, which has been legally formalized as a guardianship. These additional considerations count in our de novo conclusion that Shane's and Eric's best interests are best served by going to Texas with their guardians.

## CONCLUSION

We conclude that it is in the best interests of Shane and Eric that they remain in the custody of Cole and Patricia, their guardians. Cole and Patricia are granted permission to take the children with them when they move to Texas.

AFFIRMED.